**BRAND FARRAR BUXBAUM, LLP**

David C. Buxbaum (Bar No. 97235)
5/F., Landmark East
12 Ice House Street
Central
Hong Kong
Telephone: (852) 2523 7001

FILED
DISTRICT COURT OF GUAM

JUL 22 2002

MARY L. M. MORAN
CLERK OF COURT

Attorneys for Plaintiffs, Cui Pengqiao & Ou Weijie

UNITED STATES DISTRICT COURT

FOR THE GUAM

| | |
|---|---|
| Cui Pengqiao & Ou Weijie<br><br>        Plaintiffs<br><br>            vs.<br><br>United States of America,<br><br>the Government of Guam,<br><br>Continental Airlines,<br><br>Immigration and<br><br>Naturalization Service, Joe<br><br>Badgett II and John Does<br><br>1-20<br><br>        Defendants | Civil Action No.:<br>CV-02-00018<br><br>Complaint under the Constitution of the United States of America, Federal Law, including the Federal Torts Claims Act and the Law of the Guam |

This action is brought under the United States Constitution, Federal Law including the Federal Torts Claims Act, 28 U.S.C. 1346(b), 2671 et seq., and other Federal Laws and the Law of the Guam, as it more fully appears hereinafter.

THE PARTIES

Plaintiffs, ethnically Chinese persons, both citizen of the Marshall Islands, are businessmen, active in business in Asia, including in the Marshall Islands, the People's Republic of China and elsewhere.

Defendants are the United States of America, various employees of the United States Government and government of Guam, Continental Airlines, the Immigration and Naturalization Service, Joe Badgett II or official of the said service and John Does 1-20, as yet unknown persons, all citizens or permanent residents of the United States of America.

AMOUNT IN CONTROVERSY

The amount in controversy exceeds, exclusive of interest and costs, the sum of US$500,000.

JURISDICTION

Plaintiffs bring this action to recover damages for a tortious violation of their rights under the United States Constitution, the first, fifth and fourteenth amendments to the United States Constitution, Federal Tort Claims Act, and the Law of the Guam; and under 28 U.S.C. Sec. 1331 and 1343. This action arises in part under 42 United States Code, Section 1983, which permits the institution of a Federal Civil Action for deprivation of rights, privileges and/or immunities secured by

secured by the Constitution and laws of the United States where such deprivation occurs under color of any state statute, ordinance, regulation, custom or usage; and under 28 United States Code, Section 1343, which places original jurisdiction in the federal district court for civil actions commenced by any person to redress the deprivation of such rights. Jurisdiction of this action is also conferred on this court by Section 270b(b), Title 40, United States Code.

## FACTS

1.  On or about September 8, 2001 plaintiff's Cui and Ou held new passports from the Marshall Islands, a photocopy of Certificate of Naturalization and airplane tickets for travel from the Marshall Islands to Hong Kong, with transfer in Guam, including a three-day's stay in Guam. They went to check in at the Majuro International Airport in the Marshall Islands. After examining said passports, the manager of Continental Airlines (U.S.A.) told plaintiffs that they required an original Certificate of Naturalization to take the flight to Guam in the Northern Mariana Islands, but did not require an America visa, so said trip was cancelled to obtain said Certificate.

2.  Plaintiff's went to the Majuro International Airport on the morning of September 11 with the document requested. The clerks of Continental Airlines checked their passports, original Certificate of Naturalization and airplane ticket and faxed them to the Guam Immigration and Naturalization Service ("INS") to confirm they could travel without a U.S. visa to Guam. After a half hour wait plaintiffs were

informed by Continental Airlines personnel that they could proceed. Plaintiff, Cui Pengqiao consigned on piece of luggage to Continental Airlines, boarded the plane and plaintiffs started their trip.

3. On September 11, 2001 about at 17:00p.m., plaintiffs arrived in Guam, but were originally not on the same immigration line. Plaintiff Cui gave his new passport, old passport and original Certificate of Naturalization to the immigration officer; the officer took these documents and said: "I see," and asked for plaintiff Cui for his airplane tickets, which were passed to the officer. The officer noticed the tickets were for both plaintiffs Ou and Cui, and the officer asked plaintiff Cui where plaintiff Ou was. Plaintiff Cui pointed to another line and the officer told a female immigration officer, who was checking on plaintiff Ou's documents that plaintiff Ou's Airline tickets were with plaintiff Cui.

4. Another person, apparently a senior officer of the INS, joined plaintiffs and took all plaintiffs documents and ordered them to enter the office of the INS. He then spoke to plaintiffs loudly and angrily stating to plaintiff Cui and Ou: "take out your Chinese passports". Plaintiff Cui told the officer: " plaintiffs don't have Chinese passports, plaintiffs only have Marshall Islands passports." The officer did not believe the plaintiffs and repeated fiercely and arrogantly time after time: "take out your Chinese passports!". Plaintiffs' English was poor, so plaintiffs were not able to explain their full meaning to the officer. Then plaintiff Cui took out

a foreign work permits issued by the Chinese Government and an original Certificate of Naturalization issued by Marshall Islands government. Plaintiff Cui only resorted to this act to prove he was a citizen of the Marshall Islands. After that an officer spoke stating: "plaintiff Cui needs a visa to enter the U.S.A. anyhow." Plaintiff Cui asked: "Why?" the officer replied: "because you are different from Marshall Islands people." The officer investigating the plaintiffs appeared very hostile, so plaintiffs requested an interpreter. The officer found a female clerk from Continental Airlines to be plaintiffs' Cui's and Ou's interpreter and brought in another male immigration officer. The main content of the separate investigation that proceeded concerned the origin of plaintiff Cui and Ou's passports. Plaintiff Cui finally clarified matters with the help of the interpreter, stating he became a citizen of Marshall Islands because plaintiff Cui's had invested there in 1996. The immigration officer told plaintiff Cui he needed a visa to enter U.S.A., but plaintiff Cui was informed and believed, since he invested in the Marshall Islands in 1996, he did not need a visa to enter the U.S.A., as a citizen of the Marshall Islands for five years.

5. Plaintiffs appealed to the immigration officer informing him that plaintiff Cui received visas to the U.S.A. three times and actually traveled to the USA on two occasions between August 2, 1996 and July 30, 2001; once from Shanghai, China, and once from Majuro, the capital of Marshall Islands. As far as plaintiff Cui and Ou knew entering U.S.A. with their passports did not require a

Case 1:02-cv-00018    Document 2    Filed 07/22/2002    Page 5 of 23

visa, so plaintiffs did not apply for it. What is more plaintiff Cui had several visa records of entry into the U.S.A. on plaintiff Cui's old passport. It was very easy to apply for an American visa if necessary. Furthermore Continental Airlines had checked with the INS before they flew and found visas were not required.

6.  A female clerk of Continental Airlines, the interpreter, told them:"You'd better give up trying to enter Guam, and take a flight at 19:00 tonight from Guam to Hong Kong, requiring transfer in Manila." Plaintiff Cui asked the reason, the clerk explained: "Because the officer will investigate 3 to 4 hours and you will be unhappy; you won't be allowed to enter Guam either. " Plaintiff Cui thought if the situation was like that, plaintiffs had no choice but to give up their plan to enter Guam. Plaintiffs asked the INS officer through the interpreter: "Is it true what the interpreter stated?" After obtaining confirmation from the officer, plaintiffs followed the interpreter to come to boarding gate to leave Guam, but it was too late, the plane was going to take off, so they were refused to allow the plaintiffs to board. The interpreter on the behalf of Continental Airlines made plaintiffs purchase other airplane tickets for flights from Guam to Hong Kong, requiring transfer in Manila. Plaintiffs had no choice but to change their original schedule; nevertheless, the plaintiffs missed the flight to Manila, the next day.

7.  Plaintiffs asked a male clerk of Continental Airlines when they purchased airplane tickets about Cui's luggage: "Because the officer refused us entry, and they would take

a flight tomorrow morning, what should plaintiffs do about our luggage?" The officer requested plaintiff Cui's baggage tag and took plaintiff Cui's tag to deal with plaintiff Cui's luggage.

8. The male clerk who took plaintiff Cui's luggage ticket failed to return after approximately one hour's wait. Plaintiffs went to a café in the airport lounge waiting for the clerk. There were some everyday things in plaintiff Cui's luggage such as clothes to change and wash, several important documents, one expensive watch and most important, medicine for plaintiff Cui's heart which plaintiff Cui had to take everyday. Plaintiff Cui had some medicine in the bag carried on his person, but there was little left.

9. On or about 21:00 on September 11, 2001 an immigration officer came to the plaintiffs, while they were waiting in the café. The officer who investigated plaintiff Cui in the office of INS on the prior occasion ordered plaintiffs to follow him.

10. Plaintiffs Cui and Ou followed the officer and entered the INS office again, plaintiffs were separated and interrogated separately in two offices. Plaintiff Cui requested an interpreter, and the officer made a phone call; then the interrogation by the officer of plaintiff Cui proceeded through an interpreter on the telephone as did plaintiff Ou's interrogation in a separate room..
This investigation concerned: 1) the origin of Cui's passport; 2) place of birth; 3) the time of investment in

the Marshall Islands; 4) whether Cui entered the U.S.A. before; 5) place of plaintiffs Cui's parents' birth, the place of present residence; 6) whether Cui was married, the place of his wife's residence, etc. Plaintiff Cui answered all the officer's questions truthfully. The investigation lasted about two hours. At the end of investigation the INS officer said: "The Officer fully believes Mr. Cui's statements"; and told plaintiff Cui his investigation would not affect plaintiff Cui's entering the U.S.A. next time. Plaintiff asked again: "As far as he knew, plaintiff's status did not require a visa to enter the U.S.A. The officer stated: "plaintiffs need a visa to enter the U.S.A."

11. Subsequently, plaintiffs were fingerprinted without any reason being given. Plaintiff Cui asked for a copy of investigation records, which he received, then he was told he was free to go, so plaintiff's waited for their flight in the airport lounge.

12. On or about 23:30p.m., September 11, 2001 plaintiffs tried to find the Continental Airlines clerk to retrieve Cui's luggage ticket, but plaintiffs failed to find the clerk. Plaintiffs wanted to purchase some food. A lady in a duty free shop at the airport found, told plaintiffs in Mandarin, Chinese: "No flights can depart, because some evil persons attacked the U.S.A."

13. Plaintiffs were nervous after they heard that, and did not know what had happened. Plaintiffs asked this woman to take them to Continental Airline's office or the INS.

Plaintiffs met an officer of the INS by chance on the way to the INS. This lady told the INS officer "These two men are going to Manila, what shall they do? " The INS officer answered: "Just wait in the café in the airport lounge, plaintiffs will be informed if there is any news."

14. On or about 3:00a.m., September 12, 2001 plaintiff Cui, who was sleeping was awakened by somebody who said he was a guard at the airport and requested plaintiffs to follow him. Plaintiffs thought he came to arrange a residence for plaintiffs; and followed the guard to a security office, where he permitted  plaintiffs to wait. Almost 40 minutes later, a tall INS officer brought plaintiffs to the INS office yet again.

15. When plaintiffs entered the INS office yet again, they were shocked at once by the heavy atmosphere inside the room. There were 7 or 8 immigration officers, the only voice was from a radio.  One   of   officers   showed plaintiffs a fax which carried a picture of the World Trade Center which he said had been attacked.

16. Plaintiffs sat about in the INS office. Plaintiffs were exhausted, tired and hungry. Plaintiffs requested officers to obtain an interpreter. An interpreter came soon; a female clerk of Continental  Airlines.

17. Plaintiffs asked through the interpreter:

   a) "What will you arrange for us, since all flights are cancelled?" Answered: "Don't know!"

b) "Due to the present situation, could you issue us landing visas?" Answered: "No way!"

c) "Could you issue plaintiffs landing visas after plaintiffs are guaranteed by our American friends?" answered: "No way!"

d) "Plaintiffs are very tired and want to sleep now. Could you let plaintiffs live in the airport hotel?" Answered: "No way!"

e) Plaintiff Cui told the INS officer: "you believed what I said to you and told us plaintiffs were free to go. Now, since planes cannot depart, can you please arrange for us to live in a hotel in Guam with plaintiffs own money, even in the best 5 star hotel, because plaintiffs need rest and our health does not permit this stress. If you are afraid that plaintiffs might escape, you can send somebody to watch us until plaintiffs can leave, when flights are available. Plaintiffs will pay all expenses." Answered: "No way!"

f) "Plaintiffs are customers of Continental Airlines, so the Continental Airlines Company should arrange for plaintiffs appropriately." There was no answer from the female clerk of the Continental Airlines, our interpreter.

g) "A clerk of Continental Airlines has taken plaintiff Cui's luggage tag and plaintiffs cannot find him, she answered, "they will find him soon."

18. After the interpreter finished interpreting, she went to find plaintiff Cui's luggage, and told plaintiffs to wait there and she would come back soon. She never returned.

19. On or about 6:30a.m., September 12, 2001, a tall policeman tapped plaintiff Cui and ordered plaintiff Cui to get up and took out handcuffs. Plaintiff Cui said in English at once: "No!" "Why?" Cui thought: you cannot do that, plaintiffs did not commit any crime! The officer forced plaintiffs to put on handcuffs in spite of plaintiffs protestation. Plaintiff Cui using a small amount of English requested the right to contact a lawyer; the officer did not respond to this request. Then, plaintiff Ou, who spoke almost no English, opened his eyes too and asked plaintiff Cui in Chinese: "Why? What did plaintiffs do? Plaintiffs are legal." But it was useless, he was handcuffed too. At that time there were 3 or 4 immigration officers in the area.

20. Plaintiffs feelings at that time could be described as having been humiliated for no reason and they were frightened.

21. Plaintiffs were forced into handcuffs while the immigration officers watched, without an interpreter, lawyer and nobody to read or assert their rights and without explanation Plaintiffs were forced to take their hand luggage with them (which contained a laptop computer and some medicine), and were marched out of the INS and into a prison van.

22. On or about 7:00a.m. September 12, 2001 the plaintiff were handcuffed and rode in a prison van. The prison van stopped and plaintiffs got off and entered a police

Case 1:02-cv-00018    Document 2    Filed 07/22/2002    Page 11 of 23

station. Plaintiff Cui thought it might be a mistake, so plaintiff Cui asked:

a) "plaintiffs need a lawyer." When can we have one;"Tomorrow," was the answer;

b) "plaintiffs are concerned for their family members who will worry about them because they know plaintiff Cui went to the U.S.A. They are used to receiving plaintiff Cui's phone calls when he arrives or leaves a place on every trip. May I call home?" The answer again by the police officer was " Tomorrow.";

c) "plaintiffs needs an interpreter." The police answered:"We haven't any.";

d) "Why have you handcuffed us?" The answer was: "because all flights were cancelled.".

23. Plaintiffs were then forced to turn over all of their possessions including their wallets, belt and shoelaces to the police. Plaintiffs were forced to be photographed and fingerprinted the second time.

24. Subsequently, a police officer showed plaintiffs a fax which carried a picture of the World Trade Center which had been attacked. Plaintiffs were afraid that they had been misunderstood, so they asked for an interpreter in order to explain. They were told again by a policeman: "we do not have an interpreter." Then the plaintiffs handcuffs were released and they were locked in a room that appeared to be one for criminals. After 10 minutes the door opened and plaintiffs were handcuffed again and were taken away.

25. Plaintiffs again requested a: 1) a lawyer; 2) to call home; they were told: "Tomorrow". Plaintiffs again requested an interpreter they were told: "we do not have one."

26. On or about 8:00a.m., September 12, 2001 plaintiffs were marched to a prison van by two policemen. Plaintiffs did not know where the van would go. Plaintiff Cui asked the driver, the police officer who put the handcuffs on the plaintiffs, who spoke to the plaintiffs but plaintiffs did not understand. When plaintiffs arrived at the building, plaintiff Cui recognized it was a prison. Plaintiffs wanted to ask the policeman "why" again, but plaintiffs could not adequately communicate.

27. On or about 8:30a.m., September 12, 2001 the prison van arrived at a building which was surrounded by a wire fence. When the car arrived at the first gate at the jail , plaintiff Cui asked: "Why" (are you doing this?) "I need a lawyer." They were told: "Tomorrow." "I want to call home; the response was: "No way."

28. Plaintiffs wanted to refuse to enter the jail but when plaintiffs looked at the armed policeman; their fierce sight; the tall wall and wire fence surrounding it, plaintiffs knew that they had lost their freedom without due process.

29. On or about September 12, 2001 plaintiffs entered the prison, the gate closed and the atmosphere in the prison became tense, plaintiffs followed the prison policeman's

orders mechanically. Plaintiffs were forced to take off all their clothes including their underwear.

30. Plaintiffs were subsequently permitted to put on their clothes and plaintiff Ou was dispatched to the first room, and plaintiff Cui was brought to a another room where he was told to take a mattress, and then went back to the first room. They ordered plaintiff Cui to sleep on the ground with the mattress.

31. Plaintiffs stood in the middle of the room and looked around; this place was only about 5 or 6 square meters. A platform made from cement was much higher than the ground against wall, it was considered a bed and only one person could lie on. There was a stainless steel basin, a toilet, half roll of toilet tissue against the opposite wall. There was no more room to walk after the mattress was put on the ground. The air was gloomy and the wall was gray, there were no windows, no sunlight, and the door appeared to be made of steel. After examining carefully, plaintiff Cui discovered that the bed sheet was already gray and even contained bloodstains.

32. Plaintiff Cui said to plaintiff Ou: "Plaintiffs only need to put up with this stuff until tomorrow when, we will have a lawyer and can call home". Once Plaintiffs had an interpreter and lawyer the plaintiffs felt all misunderstanding would be cleared up.

33. Or or about 13 September 2001, on the second day in jail plaintiffs were frightened by the noise of a bell like

Case 1:02-cv-00018    Document 2    Filed 07/22/2002    Page 14 of 23

sound (which plaintiffs later knew to be the noise of the gate opening, as it was electrically controlled). Seeing other prisoners coming out one by one, plaintiffs did not know what it was for and were too frightened to approach the gate. At that time, a guard on his rounds came, from whom plaintiffs requested an attorney and phone call, but the guard told them "No".

34. As far as plaintiffs knew, plaintiffs could be in custody for no more than 24 hours and during this period, plaintiffs had the right to contact an attorney and make a phone call.

35. The Plaintiffs believed the INS and police offices must have made a mistake.

36. On or about 14 September 2001, the third day in jail, plaintiffs were cold from head to foot, feeling dizzy, with pains in their chest. Plaintiffs did not have enough food to eat, and the drinking water smelled strange, but they dared not to request a doctor, since even an attorney was not allowed.

37. The gate opened again, this time for exercise (which plaintiffs later came to know was from 6:30am to 7:30 am), with dozens of prisoners staring at us, how dare plaintiffs step out? Since our freedom was lost, lost for no reason, the rusty iron gate had become the last boundary for plaintiffs' security.

38. Plaintiffs again raised the request of wanting to contact an attorney and making a phone call with the guard, but his answer was still "No".

39. On or about 15 September 2001, the fourth day in jail, plaintiffs did not know the exact time except that for exercise and meals. Plaintiffs had not defecated for four days, let alone showered. Each of plaintiffs had just one towel, one tube of toothpaste and a toothbrush, which were too inferior to used. With no clothes to replace the ones they were began to smell foul. Plaintiff Cui's heart was feeling poorly(the handbag containing Cui's medicine had been detained at the police station). There was no toilet paper found. Cui asked for some from a prisoner who came to provide water. He replied, "Wait for a moment". Later he returned to inform us the paper had run out; Cui had no other choice but to endure (plaintiffs got a bit toilet paper next day from a Korean prisoner, after their request).

40. On or about 16 September 2001, the fifth day in jail, as usual the first thing plaintiffs did is to make a request to the guard to allow then to contact an attorney and make a phone call. The answer plaintiff got each time was "No", plaintiffs still increased the frequency of these requests which was the only thing plaintiffs could do to change their present situation. Pains in the chest were getting more serious for plaintiff Cui and plaintiff Ou's head was also feeling poorly, and had serious headaches.

1    41. On or about 17 September 2001, the sixth day in jail at
2        about 4 o'clock am, the gate opened and plaintiffs were
3        led out of the cell by a guard to where plaintiffs had
4        been forced to remove their clothes on the first day.
5        Plaintiffs sighted instruments for cutting hair held by
6        the guard. Plaintiffs again requested of the guard the
7        right to contact an attorney and make a phone call, yet
8        again plaintiffs' requests were rejected. Plaintiffs
         refused to have their hair cut.
9

10   42. Plaintiffs both valued their hair and would not have it
11       cut; the situation became a stalemate. The guard because
12       impatient, approached plaintiffs ferociously ready to hit
13       them and shouted for them to sit. Although not fully
14       understanding what the guard said, plaintiffs could see
15       while he was waving the electric clippers in his hand, his
16       eyes were  hostile, his arteries and veins were quivering
17       as a result of rage. Plaintiffs' felt if they insisted on
18       refusing to have their hair cut, their situation might be
19       very dangerous, because the guard may not act according to
         law.
20

21   43. Plaintiffs first  were forced to sit down, there was no
22       apron.   Plaintiffs took off their clothes which had not
23       been changed for days. Bit by bit they saw their hair
24       dropping. The guard worked very quickly; plaintiffs hair
25       was cut in a style plaintiffs never experienced before,
26       all the hair shaved off, yet with bits of long hair
27       remaining on some parts. Plaintiffs were brought back to
         their cell after their haircut, not knowing what it meant,
28

1    but feeling that things were getting more serious, they
2    were very frightened.

3

4    44. Plaintiff Cui's and Ou's hair had been cut without any
5        explanation, which at their place of birth was a symbol of
6        having been condemned to death.

7
8    45. On or about 17 September 2001, at 6:00 am plaintiffs were
9        placed in the patrol wagon for the third time; they asked
10       the policeman at the exit "Where we going?". The police
11       officer when put the handcuffs on the plaintiffs replied :
12       "To the Airport". At the security office of the Guam
13       Airport, plaintiffs' personal articles such as hand
14       luggage, wallets, belts, etc were returned to the
15       plaintiffs. The officer of the Immigration and
16       Naturalization Service came too, asking plaintiffs to
17       process airline departure formalities and then leave.
18       Plaintiffs produced tickets purchased on 12 September to
19       Hong Kong for confirmation; the officer refused to allow
20       them to travel to Hong Kong. Plaintiffs asked for the
21       reason, he did not answer. Then plaintiffs turned to the
22       Continental Airlines employees and inquired why were
23       plaintiffs not allowed to go to Hong Kong. He stated
24       because the Immigration and Naturalization Service did not
25       approve this; they insisted that plaintiffs buy another
26       tickets to the Marshall Islands. Plaintiffs were forced
27       again to buy two tickets to the Marshall Islands for
28       flight at about 7:00 am, 17 September from Guam.

     46. Plaintiff Cui told the female clerk of Continental
         Airlines that he had baggage with the luggage check in

their hands and asked to get it back, but he was ignored. Plaintiffs again requested, this time of the Continental Airline's staff, that they be provided with an interpreter; they were told there was no interpreter. After constant requests, a female clerk from the Continental Airlines agreed to act as an interpreter. They asked her about Cui's baggage and why their schedule was changed, she told plaintiffs this was the demand of the officer from the Immigration and Naturalization Service. As for their baggage, after inquiring of her colleagues, she told plaintiff Cui perhaps had it gone to Manila and he would get it at the international airport of Majuro and Cui may go there to pick it up.

47. The officer of the Immigration and Naturalization Service, who had been watching plaintiffs did not return their passports till plaintiffs were to board the plane. Travel to the Marshall Islands was quite costly to plaintiffs; they were required to purchase several tickets.

48. Sitting in the plane, plaintiffs had to avoid the curious sights from other passengers because of their prisoner haircuts.

49. Arriving at the Majuro Airport, plaintiffs asked their friends by phone to meet them. They even failed to recognize plaintiffs at the Airport.

50. Returning to the Marshall Islands, plaintiff Cui felt quite poorly, and went to the hospital. After a cardiogram was conducted, Cui was informed of aggravated heart

trouble and high blood pressure. Having taken the medicine dispensed, he went to the hospital for confirmation. Although Cui's blood pressure became normal, Cui's was told his heart still had problems. Plaintiff Ou suffered from headaches.

51. Plaintiff Cui went to the Majuro Airport five or six times for his baggage, but failed to obtain it. Later Cui was informed the baggage had been lost.

52. Cui thought he might feel relieved at home, but Cui was often wakened from dreams. All the experience in the jail of Guam had been engraved deeply on his mind, which he really wanted to forget, but could not. Each time America was referred in newspaper or TV, he would become depressed as a result of his terrible experience.

53. Before Plaintiff Cui worked over 10 hours a day, and now he could only work 4 or 5 hours per day as he could hardly concentrate his thoughts and attention. The doctor said good and long rest was necessary for plaintiff Cui to recover. Plaintiff Ou also suffered from inability to work.

54. What embarrassed Cui's most was the question of his daughter of eight years, "Why were you in jail, dad"? It was a mistake they made, he replied. She kept on, "Why did they make the mistake, have they ever been punished for that"?; Cui's found no words to answer.

## RESULTS OF DEFENDANTS' WRONGFUL ACTS

That the plaintiffs had a right to be free from unreasonable searches of their person and of wrongful intrusion into their individual private lives, which would outrage or cause mental suffering, shame, or humiliation to a person of ordinary sensibilities; to be free from false imprisonment, assault and battery and racial and ethnic discrimination. The plaintiffs had the right to due process of law, to be informed of any charges against them, to obtain counsel of their choice, to travel to destinations of their choice, to telephone their families, to reside in quarters of their choosing, to medicine necessary to protect their health and to cut their hair in the place and manner of their choosing.

The defendants, with impunity, violated all of these rights of the plaintiffs.

That as a direct and proximate cause of the wrongful acts of the defendants, the plaintiff's suffered extreme indignities and humiliation, severe emotional distress, mental anguish, loss of liberty, assault, battery, loss of standing in the community, and have been held up to ridicule before their peers and have been deprived of the right to clear exercise of their rights, by the above deprivations.

That the actions of the defendants impeded and hindered the course of justice with the intent to deny the plaintiffs the equal protection of the laws and due process of law and freedom of their persons and their rights to property and freedom of speech.

C:\My Documents\Tina\Ou Wei Jie Cui Peng qiao744001\Legal\complaint180602.doc

COMPLAINT

That the actions of the defendants, jointly and severally, entitle the plaintiff to an award of exemplary and punitive damages.

JURY DEMAND

Plaintiffs demand a jury for trial of this action.

WHEREFORE, plaintiffs pray:

A)  For judgment against defendants in amount of US$10,000,000.
B)  For costs and interest on the amount due and owing.
C)  That plaintiffs be awarded punitive damages in an amount to be determined.
D)  For such other and further relief as is or may later appear appropriate.


Date: 18 June, 2002

By: _____
     Attorney for Plaintiffs
     Brand Farrar Buxbaum LLP
     5/F., Landmark East
     12 Ice House Street
     Central
     Hong Kong

# VERIFICATION

CITY OF HONG KONG
Country of CHINA      } ss.:

Cui Pengqiao, being duly sworn, deposes and says that he is a
citizen of the Marshall Islands with a domicile in Majuro,
Marshall Islands and presently is working in Hangzhou, China;
that he is one of the plaintiffs herein; and that he had the
foregoing complaint translated read to him in Chinese and
knows the contents thereof and that the same are true of his
own knowledge except as to the matters therein stated to be
alleged on information and belief, and as to those matters he
believes them to be true.

_CUI PENGQIAO_
CUI  PENGQIAO
Date: 18 June 2002